

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 22, 2026

**BY ECF AND EMAIL**
The Honorable Lindsay Saxe Griffin
United States Magistrate Judge
Middle District of Florida

The Honorable Laura Taylor Swain
Chief United States District Judge
Southern District of New York

Re:    ***United States v. William Antonio Solis***, 26 Cr. 149 (LTS)

Dear Judge Griffin:

In advance of presentment in the above-captioned case pursuant to Federal Rule of Criminal Procedure 5(c)(3), the Government respectfully submits this letter to provide the Court and defense counsel with a summary of the charges unsealed today in Indictment 26 Cr. 149 (LTS) (the "Indictment") and the bases for the Government's motion for pretrial detention of the defendant.

## I.    The Indictment and the Arrest

On April 21, 2026, a grand jury sitting in the Southern District of New York returned the Indictment, which charges the defendant with two counts of Murder While Engaged in a Narcotics Conspiracy, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.  As explained below, both counts stem from a drug-related double murder that the defendant perpetrated more than 30 years ago in the Bronx, New York (the "Double Murder").  The defendant was arrested this morning and will be presented today in the Middle District of Florida.

## II.    The Double Murder[1]

On or about June 21, 1993, the defendant and two of his co-conspirators ("CC-1" and "CC-2") organized a robbery of a drug dealer in New York City named Luis Guerrero.  During the course of that robbery, the defendant and his co-conspirators executed Guerrero and his wife, Danis Sime, shooting both victims in the head.  The Double Murder was committed in the presence of the couple's then three-year-old child.

---

[1]    The facts described below come from, among other sources, law enforcement reports, forensic (fingerprint) evidence, and witness statements.

More specifically, on or about June 21, 1993, the defendant, together with CC-1 and CC-2 set out with the intent to commit a drug robbery. To that end, they found a supplier (Guerrero), and CC-1 attempted to arrange what was ostensibly a purchase—but in reality was a planned theft—of six kilograms of cocaine from Guerrero, who agreed to supply two kilograms on that date. CC-1 arranged to meet Guerrero at an apartment located on the second floor of an apartment building in the Bronx, New York (the "Apartment"). After arranging the transaction, CC-1 and CC-2 went to pick up the defendant.

The three men then drove to and entered the Apartment. The defendant was carrying a gun in his waistband. Soon, Guerrero arrived, carrying two kilograms of cocaine. Once Guerrero entered the Apartment, CC-1 directed Guerrero into the bedroom, where he told Guerrero the money was located. As Guerrero entered the bedroom, the defendant approached Guerrero from behind, pointed his firearm at Guerrero, and threatened to shoot Guerrero if he did not comply with the men's demands. Guerrero resisted, so the defendant and CC-1 forced Guerrero to the ground, restrained his hands behind his back using a wire hanger, and then wrapped duct tape over Guerrero's hands.

CC-1 went outside to Guerrero's car and shortly thereafter returned to the Apartment with Sime and their three-year-old child. The defendant and CC-1 forced Sime to the ground and restrained Sime's hands behind her back using a wire hanger. The defendant wrapped duct tape over her hands. After Sime had been restrained, CC-1 removed several pairs of latex gloves from a box in the Apartment and gave the defendant and CC-2 each a pair. The defendant put on the gloves.

The defendant and CC-1 then dragged Guerrero out of the bedroom into the living room, separating him from his wife. The three-year-old child was still present in the Apartment. After a discussion about what to do, the defendant and his co-conspirators decided they had no choice but to kill Guerrero and Sime. At that point, the defendant stepped into a leading role. He took a pillow, wrapped it around his hand (in which he was holding his firearm), and went into the bedroom where Sime was lying on the floor. The defendant then shot Sime once in the head. After executing Sime, the defendant returned to the living room. Several minutes later, the defendant again wrapped his firearm in a pillow, approached Guerrero, who was lying on the floor in the living room, and shot him once in the head, killing him. The crime scene photographs depicted below (Sime on the left and Guerrero on the right) show the bloody aftermath of the defendant's Double Murder:[2]

---

[2]    The Government respectfully requests that the Court permit the Government to redact the crime scene photographs from the publicly filed version of this detention letter. Although the Government's detention letter is a judicial document to which the presumption of public access attaches, *see United States v. Amodeo*, 44 F.3d 141, 146 (2d Cir. 1995), the presumption is outweighed here by the countervailing interests of privacy of innocent third parties and victims, including the murder victims' then three-year-old son, who is now a 36-year-old adult, *see Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 622 (S.D.N.Y. 2011) (cleaned up); 18 U.S.C. § 3771(a)(8) (explaining that crime victims have the "right to be treated with fairness and respect for [their] dignity and privacy").



After the Double Murder, the defendant and his co-conspirators attempted to conceal their involvement by, for instance, removing the wire hangers and duct tape that they had used to bind the victims. Despite these efforts, several pieces of duct tape and other evidence were left behind. The three men then left the Apartment, leaving behind two corpses, but carrying (1) items of potential evidentiary value that they thought to remove, (2) the two kilograms of stolen cocaine, and (3) the victims' three-year-old child, who was now an orphan. The perpetrators then drove to the victims' residence with the child. Once there, the defendant and CC-1 entered the victims' apartment and ransacked it, looking for drugs and money, before leaving the child there, alone.

The Double Murder was reported in the press (*see* image below), but the case remained unsolved for more than 30 years. As described above, when the defendant and his co-conspirators left the Apartment after the Double Murder, they tried to remove items of potential evidentiary value. Nevertheless, pieces of duct tape were found at the scene. Although law enforcement was able to lift identifiable fingerprints from the duct tape back in 1993, no match was identified until approximately June 2025, when the defendant's print was matched to the duct tape found at the crime scene.



## Tot's horror as parents are slain

By LARRY CELONA
and SANDY GONZALEZ

A Bronx woman and her boy-friend were found executed yesterday after their terrified 3-year-old son told police that a man pointed a gun at his mother and "took her away."

Cops discovered the bodies of Danis Sime, 28, and Luis Emigdio Guerrero, 31, about 24 hours after the little boy told his story to detectives.

Each victim had been shot in the head, execution-style.

They were found about 4 p.m. in an apartment on Nelson Avenue in Morris Heights after people in the area reported hearing gunshots.

Sime was found in the bedroom. Guerrero in the living room.

Police had no immediate motive, but said they they were looking into the possibility of a drug connection.

Narcotics were found in the victims' apartment on McGraw Avenue in Parkchester, and in the apartment where the bodies were found — about two miles away.

Neighbors in Parkchester saw the little boy, whose name is ██, standing on the lawn in front of his apartment building on Fathers' Day.

"He was screaming, 'Daddy, Daddy,'" said Chris Anton, who lives on the block.

"He was scared and he was

Anton, who knows the family, went to the child's apartment and found no one inside. He noticed that the bedroom and kitchen appeared to have been ransacked.

Anton asked ██ what had happened.

"I tried to ask him questions and all he would say was, 'El otro' (someone else). El Otro took his mother and put a cover over her head."

██ told Anton that his father had gone to "the other house."

It wasn't clear what the child meant.

Anton called police, who questioned the boy again.

He told detectives that a man had knocked on the door and his mother answered.

██ said the man pointed a gun at his mother's face, covered her head with a pillowcase and "took her away," a police source said.

Another neighbor reported hearing noises from the apartment earlier in the day.

Anton cared for ██ until police located an uncle, who took the boy in.

"I bought him pizza, ice cream, anything he wanted," Anton said.

Residents said the family had lived in the apartment about two years. "They're quiet nice people," said one neighbor. "They never bothered anyone."

**RUBBED OUT:** *Family photo of murdered dad Luis Emigdio Guerrero holding ██, who also lost mom Danis Sime (inset).*

## III.    The Defendant

William Antonio Solis, 62, was born in the Dominican Republic in 1964. After immigrating to the United States in or around 1981, Solis settled in the New York City area and became a lawful permanent resident in or about 1989. As described above, Solis committed the Double Murder on or about June 21, 1993. According to information that Solis provided to the Immigration and Naturalization Service, Solis relocated to the Tampa, Florida area in or about December 1994, *i.e.*, approximately 18 months after committing the Double Murder. In May 1995, Solis was arrested following a domestic dispute, for which he was convicted of battery, a misdemeanor, in violation of Fla. Stat. Ann. § 784.03, and for which he received a sentence of one year probation. In or about 2001, Solis became a naturalized citizen of the United States, but he still maintains citizenship in the Dominican Republic, too.

## IV.    Pretrial Detention is Warranted

Detention is required where "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making that determination, the Court considers several factors: (i) "the nature and circumstances of the offense charged," (ii) "the weight of the evidence against the person," (iii) the "history and characteristics of the person," and (iv) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g). The Government's burden of proof as to risk of nonappearance is a

preponderance of the evidence, while it must show dangerousness by clear and convincing evidence. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

The defendant has been charged by a grand jury with among the most serious imaginable crimes. Indeed, the defendant currently faces the possibility of the death penalty. Because of the nature of the crimes charged in this case, there is a presumption that no conditions of release exist that will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A) (explaining that presumption of detention applies to defendants charged with offenses, liked drug-related murder under § 848(e)(1)(A), "for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act"). Although the presumption is rebuttable, even the rebutted presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

In this case, consideration of the § 3142(g) bail factors confirm what the presumption suggests: Pretrial detention is warranted.

To start, the defendant presents a serious risk of non-appearance. As described above, the defendant was born in the Dominican Republic and resided there until he was approximately 17 years old. He continues to maintain citizenship there. And he travels there regularly, most recently in September 2024. During the defendant's arrest earlier this morning, law enforcement officers found the defendant's Dominican cédula and a U.S. passport card in the defendant's wallet. Plainly, then, the defendant has a place to flee—home, to the Dominican Republic—where it may be difficult (or impossible) to find and then extract him to face justice in this country. What is more, the defendant has already shown that he will flee to avoid trouble. Shortly after the Double Murder, in or about December 1994, the defendant left New York City and relocated to Tampa, Florida. If convicted in this case, the defendant will serve an extremely long sentence—a minimum of 20 years' imprisonment and a maximum of death. *See* 21 U.S.C. § 848(e)(1)(A). Given the defendant's age (62), it is therefore likely that he will spend the rest of his life in prison. And although this case is old, the weight of the evidence against the defendant is strong. Indeed, as described above, and in addition to other evidence, the defendant's fingerprint was found on duct tape recovered from inside the Apartment. Accordingly, the defendant faces a great incentive to flee. If the defendant fled New York City *before* he faced a mandatory minimum penalty of 20 years' imprisonment and a potential sentence of death, he surely poses a risk of flight now that he has been caught and charged. For all those reasons, the defendant poses an unacceptable risk of non-appearance and should be detained on that basis.

The defendant must also be detained pending trial because there are no conditions of release that will reasonably assure the safety of the community. To reach that conclusion, the Court need look no further than the nature and circumstances of the offenses charged. The defendant committed a heinous crime—the Double Murder—during which he wrestled a woman to the ground, bound two victims with duct tape, and then personally executed both victims inside the Apartment, where their three-year-old child was also present. Because of his actions, the defendant now faces a mandatory minimum penalty of 20 years' imprisonment and a potential punishment of death. There are few crimes more serious than the ones for which the defendant has now been indicted. *Cf. United States v. Aquart*, 92 F.4th 77, 105 (2d Cir. 2024) ("At the core of § 848(e)(1)(A) is specific, violent criminal activity: murder."). In part for that reason, courts

routinely detain defendants accused of drug-related murder, like the defendant has been. *See, e.g.*, *United States v. Villafane*, No. 21 Cr. 93 (VM), 2026 WL 183485, at *2 (S.D.N.Y. Jan. 23, 2026) (detaining defendant charged with violating, *inter alia*, § 848(e)(1)(A) in part because, "given the nature of the charges, the Court is persuaded that the seriousness of danger to the community in this case is substantial"). Although the defendant has not suffered any felony convictions since he committed the Double Murder, that should give the Court little comfort. Anyone capable of the type of violence and callousness involved in the Double Murder poses an unacceptable risk of danger to the community. There are no conditions of release that would reasonably assure the safety of the community.

*     *     *

More than 30 years ago, the defendant bound and then executed two people inside a Bronx apartment. Shortly thereafter, he fled to Florida and moved on with his life. Until today, he must have thought he got away with it. For the reasons set forth above, there are no conditions of release that will reasonably assure the safety of the community or the defendant's appearance in court. The Government respectfully submits that the defendant must be detained pending trial.

Respectfully submitted,

Jay Clayton
United States Attorney

By: _____
Dominic A. Gentile
Joseph H. Rosenberg
Assistant United States Attorneys
Southern District of New York

cc:    Counsel of Record (by ECF and email)
       Pretrial Services (by email)